UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------- x
KIMBERLY MCGRATH,                                    :
                                                     :
                              Plaintiff,             :
                                                     :
              v.                                     :          25-CV-80 (SFR)
                                                     :
JORDAN SCHEFF, COMMISSIONER, STATE OF                :
CONNECTICUT DEPARTMENT OF                            :
DEVELOPMENTAL SERVICES,                              :
                                                     :
                              Defendant.             x
------------------------------------------------------------- 

**MEMORANDUM & ORDER**

Plaintiff Kimberly McGrath was licensed by the State of Connecticut to operate a community companion home ("CCH") for individuals with disabilities. In the present action, McGrath accuses Defendant Jordan Scheff, Commissioner of the Department of Developmental Services ("DDS"), of retaliating against her in violation of the First Amendment. The present Opinion resolves Scheff's Motion to Dismiss, ECF No. 18, and McGrath's Motion to Strike, ECF No. ECF No. 39. For the reasons stated below, the Motion to Dismiss and Motion to Dismiss are both denied.

**I.     BACKGROUND**

**A.     Factual Background**

The following facts from the Complaint are accepted as true for purposes of this Opinion.

Kimberly McGrath was licensed by the State of Connecticut to operate a community companion home ("CCH"). Compl. ¶ 2, ECF No. 1. McGrath possesses "specialized education and training" to be a "professional parent." *Id.* ¶ 6. McGrath met an individual the Complaint

1

identifies as "Nate" thirty years ago. *Id.* ¶ 5. Nate has several severe disabilities. *Id.* After Nate was placed in the custody of the Connecticut Department of Children and Family Services ("DCF"), DCF struggled to find a permanent home for Nate. *Id.* DCF eventually entrusted Nate to McGrath's care. *Id.* ¶¶ 6-7. The State of Connecticut paid McGrath to serve as Nate's professional parent, but required that McGrath maintain her CCH license. *Id.* ¶ 7. McGrath served as Nate's professional parent for approximately thirty years, until March 17, 2022. *Id.*

The Complaint states that McGrath has consistently advocated on behalf of CCH license holders. *Id.* ¶ 8. The Complaint contends that Connecticut "treats these licensees poorly, does not compensate them appropriately," and fails to offer appropriate services for disabled people in license holders' care, which hazards the health and wellbeing of individuals with disabilities. *Id.* McGrath "was part of a group of CCH providers that organized to speak out on the inadequate resources that were being provided to care for these disabled persons under state control." *Id.* ¶ 9. Specifically, in 2018 and 2019, McGrath and other CCH providers "actively pushed to remove" a state official responsible for their oversight in the Department of Developmental Services ("DDS"). *Id.*

On December 16, 2020, Jackson Pierre-Louis, an executive within DDS who knew about McGrath's advocacy, notified McGrath that "he was placing her [CCH] license on 'Provisional Status' for a period of 90 days." *Id.* ¶ 10. The Complaint states that DDS's stated reasons for imposing provisional status were without merit. *Id.* On March 16, 2021, Pierre-Louis extended McGrath's provisional status. *Id.* ¶ 11.

On March 22, 2021, soon after Pierre-Louis extended McGrath's provisional status, McGrath wrote to Defendant Jordan Scheff, Commissioner of DDS. *Id.* ¶¶ 3, 12. McGrath notified Scheff "that she had been attending meetings to inform taxpayers of the lack of support

and funding that [Scheff] was providing to her and all CCH licensees causing detriment to the licensees and their home care persons." *Id.* ¶ 12. McGrath raised her concern that she was facing retaliation because of her advocacy for Nate and in favor of increased resources for CCH license holders. *Id.*. Scheff never responded to this letter. *Id.*

Pierre-Louis "issued a compliance order" regarding McGrath's CCH license on August 10, 2021. *Id.* ¶ 14. Although the Complaint does not describe what is included within a compliance order, the Complaint states that McGrath responded by sending a second letter to Scheff. *Id.* ¶ 14. McGrath also sent a copy of this second letter to Governor Lamont and other state leaders. *Id.* McGrath's second letter placed Scheff "once again . . . on notice of [the] lack of support and resources the State of Connecticut was providing to CCH license holders and the risk this posed to everyone including Nate." *Id.*

Scheff initially responded to McGrath's second letter by scheduling a meeting with McGrath to discuss her concerns. *Id.* ¶ 15. But when McGrath opted to formally challenge the compliance order, Scheff canceled their meeting, "claiming [McGrath] was not entitled to meet with him since she wanted an administrative hearing." *Id.* ¶ 16. The Complaint does not describe the outcome of any administrative hearing. *See id.* But the Complaint states that on February 3, 2022, Scheff approved the compliance order. *Id.* ¶ 17. As a result, on March 14, 2022, Scheff "forcibly removed Nate from the Plaintiff's home without any prior notice to the Plaintiff or Nate's guardian ad litem." *Id.* ¶ 18. And on March 17, 2022, Scheff revoked McGrath's CCH license. *Id.*

Nate was placed in two separate foster homes, neither of which was able to meet his needs. *Id.* The Complaint contends that this removal was "barbaric and abusive to Nate and designed to retaliate against the Plaintiff without any consideration to Nate's well-being." *Id.*

On June 8, 2022, following "lengthy Probate hearings," Nate was restored to McGrath's custody. *Id.* ¶ 20. Although McGrath is no longer a CCH licensee, "she remains the sole custodian and protector of Nate through an alternative program." *Id.* ¶ 21.

### B.    Procedural History

McGrath initiated the present action by filing a Complaint on January 15, 2025. Compl., ECF No. 1. Scheff moved to dismiss on May 8, 2025. Def.'s Mot. to Dismiss, ECF No. 18; Mem. of L. in Supp. of Mot. to Dismiss ("Def.'s Mem."), ECF No. 18-1. McGrath responded in opposition on July 7, 2025. Pl.'s Opp. to Mot. to Dismiss ("Pl.'s Mem."), ECF No. 30. Scheff replied on July 28, 2025. Def.'s Reply to Pl.'s Opp. to Mot. to Dismiss ("Def.'s Reply"), ECF No. 37.

McGrath moved to strike a portion of Scheff's reply on August 4, 2025. Pl.'s Mot. to Strike, ECF No. 39; Pl.'s Mem. of L. in Supp. of Mot. to Strike ("Pl.'s Strike Mem."), ECF No. 39-1. Scheff responded in opposition on August 7, 2025. Def.'s Obj. to Pl.'s Mot. to Strike ("Def.'s Strike Opp."), ECF No. 41.

Over McGrath's opposition, I stayed discovery during the pendency of the Motion to Dismiss. ECF No. 42.

## II.    <u>LEGAL STANDARD</u>

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. I must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations

to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). However, I am not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

## III.    DISCUSSION

The Complaint brings a single claim of retaliation in violation of the First Amendment. Compl. ¶¶ 22-25. In his opening brief, Scheff raises two arguments in favor of dismissal. First, he says that McGrath's speech was not constitutionally protected because Scheff, a public employee, was not speaking about a matter of public concern. Def.'s Mem. 8-12. Second, assuming *arguendo* that McGrath's speech was constitutionally protected, Scheff says that he is entitled to qualified immunity because it was objectively reasonable for him to believe that his conduct did not violate any McGrath's rights. *Id.* at 12-14.[1] I address each argument in turn.

### A.    First Amendment Retaliation

"[A]s a general matter, the First Amendment prohibits government officials from subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) (citation and internal

---

[1] Portions of McGrath's opening brief can be read to suggest that Scheff believes that he is entitled to qualified immunity *because* McGrath's speech was not constitutionally protected. *See* Def.'s Mem. 1 ("Defendant is entitled to qualified immunity because his conduct violated no constitutional or statutory right of the Plaintiff, as her speech was not protected, and it was objectively reasonable for him to believe his conduct was lawful."). I exercise my discretion to begin by analyzing whether a constitutional violation is adequately pleaded in the Complaint before considering the affirmative defense of qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (inviting lower courts to exercise their discretion in deciding how to sequentially analyze (1) whether a constitutional violation occurred and (2) whether the applicable right was clearly established).

quotation marks omitted). "To establish a claim for First Amendment retaliation, [a plaintiff] must demonstrate that: (1) [her] speech or conduct was protected by the First Amendment; (2) [s]he suffered an adverse employment action; and (3) [there exists] a causal connection between the protected activity and adverse employment action." *Grande v. Hartford Bd. of Educ.*, 804 F. Supp. 3d 334, 348 (D. Conn. 2025) (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015), *reconsid. denied*, 2026 WL 370849 (D. Conn. Feb. 10, 2026).

### 1.    Protected Speech

Scheff asserts that McGrath's speech was not protected by the First Amendment. Def.'s Mem. 8-12. Speech by public employees is analyzed under the two-step test described in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968). "The first [component] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. "If the first component is present, an employer must then show that it 'had an adequate justification for treating the employee differently [based on his or her speech] from any other member of the general public.'" *Montero v. City of Yonkers, New York*, 890 F.3d 386, 395 (2d Cir. 2018) (quoting *Garcetti*, 547 U.S. at 418). This same analysis applies to government contractors. *Bd. of Cnty. Commissioners, Wabaunsee Cnty., Kansas v. Umbehr*, 518 U.S. 668, 685 (1996). For purposes of the present motion, McGrath does not dispute that her speech should be analyzed under the *Pickering-Garcetti* framework applicable to government employees and contractors. Pl.'s Mem. 4-5.

"[I]n assessing the first prong of the retaliation test—whether a public employee's speech is protected—we must consider 'two separate subquestions': (1) whether the employee

'spoke as a citizen rather than solely as an employee,' and (2) whether [s]he spoke on 'a matter of public concern.'" *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82-83 (2d Cir. 2022) (quoting *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015)).

Here, Scheff does not dispute that McGrath spoke as a citizen; instead, he argues only that McGrath's speech was not on a matter of public concern. Def.'s Mem. 11-12. Scheff attempts to bolster this argument by attaching the two letters that McGrath sent to Scheff. ECF No. 18-2 (Letter dated March 22, 2021); ECF No. 18-3 (Undated letter).[2] The first letter, dated March 22, 2021, begins as follows:

> I am a licensed CCH Provider in the west region. I have been having a difficult time understanding why I was denied respite for berievment, my mother passed away.
>
> For the past several years I have been advocating on behalf of N and myself for more respite funding to be allocated to my CCH and have been repeatedly denied . . . . Because of my persistance: attending as many meetings as possible to let the taxpayers know that we as CCH providers are only making 3.00 an hour, I believe the DDS is harrassing me by trumping up neglible neglect charges and persuing a witch hunt.

ECF No. 18-2. The March 2021 letter also states: "I believe that it is important for the taxpayers to know that there are people doing this job and only getting paid $3/00 an hour." *Id.*

---

[2] Scheff asserts—and McGrath does not dispute—that these letters can be considered on a motion to dismiss. Def.'s Mem. 11-12; *see* Pl.'s Mem. I agree that I may consider the letters because they are integral to the Complaint. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (stating that the "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document 'integral' to the complaint.") (citation and internal quotation marks omitted); *accord Mpoy v. Rhee*, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (Garland, C.J.) (considering email incorporated to complaint by reference on Rule 12(b)(6) motion); *Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 248-49 (S.D.N.Y. 2024) (analyzing email described in complaint and attached to defendant's briefing on Rule 12(b)(6) motion).

The second letter, which is not dated, elaborated on these concerns. The letter stated:

> CCH providers provide a valuable service to the DDS/CT taxpayers and have been ignored and pushed aside when we reach out for financial assistance. Although the DDS did change the metrics for the Special Support payment to make it appear that we were getting more money, the reality is that the additional monies per month didn't change by much.
>
> Over the past year and a half, while the DDS staff stayed at home and continued to receive their salaries with basically no contact with the individuals, we were on the front line. Through all the frustrations and fear we continued to meet the needs of the individuals living in our homes. In addition, we incurred the day programming piece plus incur the day piece with minimal compensation for three months.

ECF No. 18-3, at 1. The signature page of the second letter suggests that it was also sent to Governor Ned Lamont. *Id.* at 2. The Complaint alleges it was also sent to "many other state representatives." Compl. ¶ 14.

Scheff says that McGrath's letters communicate essentially private concerns regarding her concerns about bereavement leave and levels of pay. Def.'s Mem. 11-12. McGrath recognizes that portions of her letters focused on her personal circumstances, but says that her speech also "addressed broader policy failures with statewide implications." Pl.'s Mem. 6. McGrath also argues that her letters must also be recognized within the broader context of her participation in "a broader public debate about state support for disabled individuals." *Id.* McGrath observes she engaged in "collective action" by advocating with others, and her "speech was public facing, as she attended meetings to 'inform taxpayers' and sent a letter copying the Governor of Connecticut." *Id.*

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). "Courts may consider a speaker's

motive as part of this analysis, although that factor is not dispositive." *Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 84 (2d Cir. 2022). I agree with McGrath that her Complaint alleges she engaged in speech on issues of public concern.

First, although Scheff focuses on the letters, the Complaint alleges that McGrath engaged in speech and advocacy outside of the letters. The Complaint describes McGrath's membership within "a group of CCH providers that organized to speak out on the adequate resources that were being provided to care for [] disabled persons under state control." Compl. ¶ 9. Although the Complaint states that these efforts culminated in "2018/2019" with the removal of one DDS executive, *id.*, the Complaint describes McGrath's public advocacy as continuing into 2021, *id.* ¶ 12. Scheff's briefing focuses only on the letters and does not address whether McGrath's broader advocacy should be understood as speech on a matter of public concern. *See* Def.'s Mem; Def.'s Reply.

With respect to the letters, the first letter contended that McGrath's license was being reviewed as part of a "witch hunt" and "trump[ed]" up charges motivated by the fact that McGrath was "attending as many meetings as possible to let the taxpayers know" about the low wages for providers. ECF No. 18-2. And the second letter described the sacrifices made by CCH license holders during the pandemic. ECF No. 18-3, at 1.

In *Pickering*, the Supreme Court held that a public school teacher spoke on a matter of public concern when he wrote a letter to a local newspaper that criticized the school board's "allocation of school funds between educational and athletic programs, and of both the Board's and the superintendent's methods of informing, or preventing the informing of, the district's taxpayers of the real reasons why additional tax revenues were being sought for the schools." 391 U.S. at 569. The Court reasoned that "whether a school system requires additional funds

is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive." *Id.* at 571. Because of the special insight that teachers have into the needs of students and the educational system, the Court held that teachers must "be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* at 572.

Following *Pickering*, the Second Circuit has held that a police officer spoke on a matter of public concern when he voiced a concern that service cutbacks were "bad for the police force, bad for members of the [police union] and bad for the community," reasoning that the police officer had engaged in debate on how a change in policy would affect public safety. *Montero v. City of Yonkers, New York*, 890 F.3d 386, 400 (2d Cir. 2018). Similarly, the Second Circuit has repeatedly acknowledged that "possible governmental misconduct is a legitimate and an important topic of public concern." *Specht v. City of New York*, 15 F.4th 594, 601 (2d Cir. 2021). Moreover, "the alleged misconduct need not be systemic or pervasive to touch on a matter of public concern." *Id.*

Consistent with this precedent, I conclude that the Complaint adequately supports the inference that McGrath spoke on a matter of public concern insofar as her communications (1) alerted state officials to her concern that the agency was engaged in serious misconduct by retaliating against her based on her advocacy and (2) described broader challenges faced by social service providers, particularly during the pandemic. *See Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) (stating that "exposure of official misconduct . . . is generally of great consequence to the public") (citation and internal quotation marks omitted; alterations adopted); *Balchan v. City Sch. Dist. of New Rochelle*, No. 21-CV-04798 (PMH), 2023 WL 4684653, at *6 (S.D.N.Y. July 21, 2023) ("The COVID-19 pandemic is unquestionably a

matter of public concern.'"); *cf. Shara*, 46 F.4th at 87 (finding that "dispute among school employees about the best way to report maintenance issues involving the School District's buses" did not constitute speech on a matter of public concern").

To be sure, McGrath's concern regarding bereavement leave does not present an issue of public concern because her ability to obtain leave following the passing of her mother "cannot be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146; *see also Specht*, 15 F.4th at 601 (holding that "internal workplace grievances [are] not matters of public concern"). Nonetheless, dismissal is not warranted here because McGrath's speech was not limited to challenging a decision to deny her leave. *See Huth v. Haslun*, 598 F.3d 70, 74 (2d Cir. 2010) (rejecting "a categorical approach that places all speech aimed at redressing personal grievances in the employment context beyond the scope of the First Amendment").

*Coward v. Gilroy*, cited in Scheff's briefing, does not require another result. No. 3:05-CV-285, 2007 WL 1220578 (N.D.N.Y. Apr. 24, 2007), *aff'd*, 306 F. App'x 647 (2d Cir. 2009). In *Coward*, the operators of a family care home alleged that New York's Office of Mental Retardation and Developmental Disabilities retaliated against them by revoking their care licenses after they voiced concerns regarding the appropriate treatment for one of the residents in their home. 2007 WL 1220578, at *1-2. The district court granted summary judgment for defendants, reasoning that plaintiffs were not addressing a matter of public concern because the plaintiffs' speech was limited to comments that were "specific and personal in nature and related to . . . the situation of one of their consumers." *Id.* at *6. The Second Circuit affirmed via summary order, stating that, in context, "the Cowards' speech was essentially personal in

nature, as it concerned the medical care of one individual, even if one of their comments could be construed broadly to implicate broader matters." 306 F. App'x at 649.

Here, in contrast, because of the procedural posture of this case, I cannot say that context demonstrates that McGrath's speech was entirely personal in nature. Indeed, the Complaint plausibly alleges that McGrath engaged in public advocacy focused on Connecticut's service delivery model for individuals with severe disabilities rather than merely objecting to the care situation for the individual in her care. For these reasons, *Coward* does not undermine my conclusion that McGrath spoke on a matter of public concern.

I therefore find that the Complaint adequately supports the inference that McGrath's speech was protected by the First Amendment.[3]

### 2.    Causal Connection

In his reply memorandum, Scheff argues that the Complaint also fails to state a claim because the connection between McGrath's protected speech and adverse actions is too attenuated. Def.'s Reply 2-5. McGrath contends that this argument should not be considered because it was raised for the first time in a reply brief. Pl.'s Strike Mem. 1-2. Although Scheff

---

[3] Although not disputed by Scheff, I observe that the Complaint also suggests that McGrath was speaking as a citizen rather than an employee insofar as (1) a civilian analogue exists for the manner in which she communicated to elected officials (Governor Lamont and state representatives) her concerns about social service delivery in Connecticut and participated in meetings to inform taxpayers about the needs of individuals with severe disabilities and (2) it would seem that these communications and meetings were not pursuant to her official duties. *See Long v. Byrne*, 146 F.4th 282, 300 (2d Cir. 2025) (observing that "the inquiry into an employee's job responsibilities is a practical one that requires analyzing various contextual factors, and that this case is at the motion to dismiss phase, further development of the factual record is necessary to fully understand the extent to which [plaintiff's protected speech] intersected with her responsibilities") (citation and internal quotation marks omitted).

argues otherwise, Def.'s Strike Opp. 2, I agree that this argument in favor of dismissal appears nowhere within his opening brief.[4]

Nonetheless, I exercise my discretion to analyze the merits of Scheff's argument regarding causation. "In order to satisfy the causation requirement, allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action." *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (citation and internal quotation marks omitted). "This burden may be met '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Buchanan v. City of New York*, 556 F. Supp. 3d 346, 360 (S.D.N.Y. 2021) (quoting *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Washington v. Cnty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004).

McGrath says that the Complaint's allegations regarding the proximity between "her advocacy and adverse actions," together with Scheff's decision to cancel a meeting with McGrath, support the inference that the adverse actions were caused by her speech. Pl.'s Mem. 7-8. Scheff's argument on causation boils down to asserting that too much time passed between the dates when McGrath sent her second letter and March 2022, which is when (1) Nate was

---

[4] I recognize that McGrath's opposition memorandum did briefly touch on the issue of causation. Def.'s Mem. 7-8. But because Scheff's opening brief did not discuss causation, McGrath did not have fair notice that Scheff sought dismissal on these grounds. *See, e.g., In re Harris*, 464 F.3d 263, 268 n.3 (2d Cir. 2006) (Sotomayor, J.) ("We generally do not consider issues raised in a reply brief for the first time . . . because if [a movant] raises a new argument in a reply brief [the non-moving party] may not have an adequate opportunity to respond to it.") (citation and internal quotation marks omitted).

removed from McGrath's care and (2) DDS revoked McGrath's CCH license. Def.'s Reply 2-6; *see also Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 49 (2d Cir. 2018) (summary order) ("Temporal proximity alone is generally insufficient after about three months.").

The date of the second letter appears nowhere within the Complaint, *see* Compl. ¶¶ 13-15, and is similarly absent from Scheff's exhibits, *see* ECF No. 18-3. However, it is clear from the chronology set forth in the Complaint that McGrath sent the second letter at some point after receiving notice of the compliance order issued upon her license by Pierre-Louis in August 2021. Compl. ¶¶ 13-14. Thereafter, Scheff scheduled—and then cancelled—the meeting with McGarth, and on February 3, 2022 "approved and enforced" the compliance order that triggered the March 2022 removal of Nate and revocation of McGrath's license. *Id.* ¶¶ 16-19. Accordingly, it was less than six months, at most, between the time McGrath sent the second letter and Scheff allegedly took adverse action.

Moreover, McGrath's interactions with Scheff pre-date the sending of the second letter. McGrath sent the first letter to Scheff in March 2021, complaining that the investigation of her license was in retaliation for her advocacy. Thereafter, in August 2021, Pierre-Louis issued the compliance order. Although Scheff's reply memorandum states that this initial compliance order was issued "without Defendant's knowledge," the Complaint merely states that Scheff's name was not listed on the order. *Compare id.* ¶ 14, *with* Def.'s Reply 4. Thus, the Complaint supports the inference that by the time the order issued in August 2021, Scheff was on notice of McGrath's concern about retaliation.

Because the Complaint alleges that McGrath engaged in a continuous dialogue with Scheff over the year preceding the revocation of her license, and in light of the Second Circuit's

decision not to "draw[] a bright line to define the outer limits beyond which a temporal relationship is too attenuated," I conclude that the timeline alleged in the Complaint plausibly supports an inference of causation. *Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001); *see also Littlejohn v. City of New York*, 795 F.3d 297, 319-320 (2d Cir. 2015).

In any event, McGrath's theory of causation does not rely on temporal proximity alone. The Complaint alleges that there was no merit to the allegations that triggered the investigation of McGrath's license. Compl. ¶¶ 10-11. McGrath contends that Scheff's decision to cancel a meeting with her supports an inference that her protected speech, rather than legitimate regulatory concerns, caused him to revoke her CCH license. Pl.'s Mem. 7-9; Compl. ¶ 16. Scheff argues that the state regulations relevant to DDS administrative hearings supported the decision to cancel his planned meeting with McGrath because it would have been inappropriate to have an *ex parte* conversation ahead of an administrative hearing. Def.'s Mem. 13. But in resolving a motion to dismiss, I cannot make such an inference in Scheff's favor. Instead, I conclude that Scheff's decision to cancel the meeting rather than discuss McGrath's concerns that she was facing retaliation from state officials provides additional circumstantial evidence supporting an inference that Scheff's decision to revoke the license was motivated by McGrath's protected speech, not legitimate regulatory concerns.

In sum, at this juncture, I cannot resolve the full extent of Scheff's knowledge and participation in actions taken prior to his final approval of the compliance order. I also do not have the precise date that the second letter was sent. However, for purposes of the motion, I conclude that the Complaint has plausibly alleged Scheff retaliated against her based on the exercise of her First Amendment rights.

### B.    Qualified Immunity

Scheff argues that, even if I conclude the Complaint supports the inference that Scheff took an adverse action against McGrath because of her protected speech, I should nonetheless dismiss the Complaint because he is entitled to qualified immunity. Def.'s Mem. 12-14.

"A defendant seeking to dismiss a complaint under Rule 12(b)(6) on the basis of a qualified immunity defense 'will generally face a difficult road.'" *Brown v. Off. of State Comptroller*, 211 F. Supp. 3d 455, 472 (D. Conn. 2016) (quoting *Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015), *aff'd in part, appeal dismissed in part sub nom. Brown v. Halpin*, 885 F.3d 111 (2d Cir. 2018). Because qualified immunity is an affirmative defense that a defendant has the burden of pleading in the answer, the complaint "need not plead facts showing the absence of such a defense." *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994). Moreover, on a motion to dismiss premised on qualified immunity, a "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). For these reasons, "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch." *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020), *abrogated on other grounds by Case v. Montana*, 146 S. Ct. 500 (2026).

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). "'Even if the right was clearly established,' a court can still find a suit blocked by

qualified immunity where 'it was objectively reasonable for the officer to believe the conduct at issue was lawful.'" *Steele-Warrick v. Microgenics Corp.*, 671 F. Supp. 3d 229, 246 (E.D.N.Y. 2023) (quoting *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013)).

Scheff does not dispute that the Complaint adequately pleads that McGrath spoke as a private citizen rather than pursuant to her official duties. Instead, Scheff contends that it was not clearly established that the First Amendment prohibited Scheff from revoking McGrath's CCH license or removing Nate from her home because Scheff did not understand McGrath to be speaking about a matter of public concern. Def.'s Mem. 13. This argument is unavailing because it "hinges on the same disputed issues of fact" that cannot be resolved on a motion to dismiss. *Buchanan v. City of New York*, 556 F. Supp. 3d 346, 362 (S.D.N.Y. 2021). As I have explained, the Complaint supports an inference that McGrath spoke on a matter of public concern by (1) describing what she perceived to be misconduct by state officials and (2) highlighting broader challenges impacting delivery of services to individuals with severe disabilities in Connecticut, both during the pandemic and afterwards.

Beyond citing in passing to *Coward*, 306 F. App'x at 649, a case that is inapposite to the facts pleaded in the Complaint, Scheff does not make any meaningful attempt to distinguish this case from the long line of authority going back to *Pickering* establishing that an employer cannot retaliate against an employee for speaking as a citizen about a matter of public concern. *See, e.g.*, *Specht*, 15 F.4th at 601-02 (holding that complaint about "government malfeasance" by fire department employee constituted speech on a matter of public concern); *Montero*, 890 F.3d at 400 ("[S]peech about the termination of the police units—which Montero allegedly stated would endanger public safety—plainly constituted speech on a matter 'of political, social, or other concern' to the Yonkers community"); *Golodner v. Berliner*, 770 F.3d 196,

203 (2d Cir. 2014) ("[W]e have held that matters implicate the public interest when the plaintiff 'wanted to debate issues of discrimination, that [the plaintiff's] suit sought relief against pervasive or systemic misconduct by a public agency or public officials, or that [the plaintiff's] suit was part of an overall effort to correct allegedly unlawful practices or bring them to public attention.'") (quoting *Huth v. Haslun*, 598 F.3d 70, 75 (2d Cir. 2010)); *Pickering*, 391 U.S. at 569-70.

Finally, Scheff contends that he acted in a manner that was objectively reasonable. Def.'s Mem. 13-14. In particular, Scheff argues that he acted reasonably by refusing to meet with Scheff after she demanded an administrative hearing. *Id.* at 13. This argument overlooks the other adverse actions alleged in the Complaint, including the decision to remove Nate from McGrath's home and to revoke her CCH license. Moreover, this argument fails because it requires me to make inferences in favor of Scheff and assume facts not stated in the Complaint. *See McKenna*, 386 F.3d at 436. Although discovery may confirm that Scheff canceled a scheduled meeting with McGrath because he thought it was more appropriate to hear from her in the formal administrative hearing, that conclusion does not readily appear on the face of the Complaint. At this stage, I am bound to accept as true the Complaint's allegation that Scheff canceled his scheduled meeting because he "refused to hear and consider the problems with his department and the grave effect it had on the mentally disabled persons under his care." Compl. ¶ 16. I therefore cannot resolve from this record whether Scheff is entitled to qualified immunity.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion to Dismiss is DENIED and Plaintiff's Motion to Strike is DENIED. Defendant shall respond to the Complaint on or before March

27, 2026. On or before April 10, 2026, the parties shall confer and file a Local Rule 26(f)

Report proposing deadlines for discovery.

**SO ORDERED.**

New Haven, Connecticut
March 5, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge